**NEW YORK PUBLIC INTEREST RESEARCH GROUP,**
**Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Office of Management and Budget, Defendants.**

**No. 02 Civ. 5130(AKH).**

United States District Court,
S.D. New York.

March 10, 2003.

---

David C. Vladeck, with whom Andrew Goldberg and Michael Tankersely were on the brief, for plaintiff.

James B. Comey, United States Attorney for the Southern District of New York, and Elizabeth Wolstein, Assistant United States Attorney, for defendants.

## *OPINION AND ORDER PARTIALLY GRANTING AND PARTIALLY DENYING SUMMARY JUDGMENT REGARDING EXEMPTIONS FOUR AND FIVE OF THE FREEDOM OF INFORMATION ACT*

HELLERSTEIN, District Judge.

From the 1940s until 1977, two electrical capacitor manufacturing plants owned and operated by the General Electric Company ("GE") discharged over a million pounds of polychlorinated biphenyls ("PCBs") into the Hudson River. The accumulation of PCBs, which are classified as probable human carcinogens, led the United States Environmental Protection Agency ("EPA") to identify the Hudson River as an agency priority and designate it as a "Superfund" site in 1984.

Under provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601, 9604, 9606, 9607, and 9622, the EPA has the responsibility of assessing hazardous environmental problems and the power to compel or negotiate with a responsible party to implement a remedy chosen by the agency. In December 2000, after long deliberation, the EPA proposed a plan for dredging the upper Hudson River to eliminate PCB contaminants, estimated to cost over $450 million. *See* Environmental Protection Agency, Hudson River PCBs Site, New York, Record of Decision, Feb. 1, 2002, at 98. GE advocated cheaper palliatives, which it argued would avoid the possibility of PCB resuspension. GE made several submissions of its views to the EPA and the Office of Management and Budget ("OMB"), including analyses of comparative estimated costs and scientific evaluations of the efficaciousness and environmental impact of its approach, and engaged in a series of meetings with the EPA and OMB between July and September 2001. In February 2002, the EPA ordered that its proposed large-scale dredging plan be implemented, and on July 23, 2002, entered into a consent order with GE requiring GE to undertake much of the investigation and other costs for the remedy.

Plaintiff, the New York Public Interest Research Group ("NYPIRG"), is a nonprofit organization engaged in environmental issues. Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), NYPIRG seeks disclosure of GE's submissions and of notes about meetings with GE made by officials of the EPA and the OMB. I am asked in this case to define the proper scope of disclosure when Exemptions 4 and 5 of the Freedom of Information Act, 5 U.S.C. §§ 552(b)(4) and (5), which relate to commercial and confidential information and intra- or inter-agency memoranda, have been invoked. The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure, each side seeking or objecting to disclosure.

## I. *Background*

### A. *NYPIRG's FOIA Requests*

On September 7, 2001 and again on October 1, 2001, NYPIRG demanded under FOIA that the EPA produce, for the period after July 1, 2001, all correspondence between the EPA and GE and all documents concerning meetings between the EPA and GE about the Hudson River PCB Superfund site clean-up. NYPIRG also requested correspondence between the EPA and two U.S. Representatives. NYPIRG promptly received all of the responsive documents related to the two Congressmen, but did not obtain any EPA documents. On November 8, 2001, NYPIRG appealed the de facto denial of its document requests. In response, several documents were produced, but the balance of NYPIRG's requests were denied. On January 15, 2002, NYPIRG appealed to higher authority within the EPA, taking issue with the invocation of exemptions and complaining that the search for documents had not been diligent and complete. On January 24, 2002, the EPA produced two additional documents and subsequently, after this lawsuit began, the EPA found and disclosed four additional documents and withheld seven others as exempt. In January 2003, the EPA produced the confidentiality agreement it had entered into with GE in July 2001.

NYPIRG also filed a FOIA request with the OMB on October 4, 2001, asking for the OMB's records of meetings and correspondence with GE concerning the Hudson River PCB Superfund site for the period after July 1, 2001. The OMB obtained a ten-day extension, but was not heard from again until after this lawsuit was filed. The OMB then produced fourteen documents in full and ten redacted documents, and withheld another thirty responsive documents. On March 4, 2003, OMB released another two documents that had been in dispute.[1]

### B. *The Instant Lawsuit*

NYPIRG brought suit pursuant to 5 U.S.C. § 552(a)(4)(B) of FOIA to compel the production of the records that it had requested. There are a total of forty-nine documents at issue. Defendants contend that the first group of forty-three documents are exempt as GE's commercial and confidential information,[2] *see* 5 U.S.C. § 552(b)(4) ("Exemption 4" of FOIA). The GE documents, many of which are entitled "Hudson River Proposal" and "Hudson River—Remedy Proposal," present its analyses of the costs, benefits, and environmental impact associated with the EPA's proposed remedy and GE's alternative remedy. Several pages are marked "Privileged & Confidential," and defendants represent that GE submitted their proposals pursuant to the July 2001 confidentiality agreement between the EPA and GE. GE, however, has not submitted any affidavits or taken a position with regard to the documents in this litigation. Defendants withhold a second group of six documents—notes and memoranda written by agency officials about the meetings with GE—by invoking the exemption for inter-agency or intra-agency communications or

---

1. I am troubled by the intermittent disclosure of documents by both defendants following the commencement of this litigation. Responsiveness to FOIA requests should not depend on a party's willingness to file a lawsuit.

2. EPA Withholding Justification Table, documents 2—13, 16, 20; OMB Withholding Justification Table, documents 9—36, and 38. Several documents, apparently copies containing notes or other agency commentary, have also been withheld under Exemption 5.

deliberations, *see* 5 U.S.C. § 552(b)(5) ("Exemption 5" of FOIA).

At oral argument held on January 22, 2003, I reviewed *in camera* a representative sample of the forty-three documents withheld pursuant to Exemption 4 and all the notes withheld pursuant to Exemption 5. I ruled that the defendants were entitled to withhold, under Exemption 5, the documents numbered 2 and 6 on the OMB Withholding Justification Table, documents 18 and 19 of the EPA Withholding Justification Table, the last six pages of the eight-page document 14 of the EPA chart, and the last two pages of the six-page document 15 of the EPA chart. I reserved decision on the balance of the documents, and asked for a supplemental submission by the government after counsel consulted with the author of the notes constituting documents 14 and 15.

## II. *Discussion*

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *see Harlen Assocs. v. Village of Mineola*, 273 F.3d 494, 498 (2d Cir.2001), the non-moving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen*, 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

■ Generally, FOIA cases are resolved on motions for summary judgment, once the documents in issue are properly identified. *See, e.g., Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir.1993). The district court makes its determination de novo. *See* 5 U.S.C. § 552(a)(4)(B). In order to prevail on a motion for summary judgment, the defendant agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA. *See id.* "Affidavits submitted by an agency are 'accorded a presumption of good faith.'" *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.1994) (citations omitted). The central purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (citations omitted). Because the basic objective behind FOIA is disclosure, not secrecy, the nine exemptions are to be "narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982).

### A. *Documents Withheld Pursuant to Exemption 4*

Under 5 U.S.C. § 552(b)(4), the government may exclude "trade secrets and commercial or financial information obtained from a person and privileged or confidential" from production under FOIA. The issue at hand is whether or not forty-three documents can be withheld by defendants pursuant to Exemption 4. The privilege applies if the defendants show that the information is (a) commercial or financial,

(b) obtained from a person, and (c) privileged or confidential. *American Airlines v. Nat'l Mediation Bd.*, 588 F.2d 863, 867–68 (2d Cir.1978) (citing *Consumers Union v. Veterans Admin.*, 301 F.Supp. 796, 802 (S.D.N.Y.1969)).

i. *"Commercial" Information*

The legislative history sheds little light on the precise scope of the definition of "commercial or financial." Exemption 4 originally protected "trade secrets and other information obtained from the public and customarily privileged or confidential." S.Rep. No. 88–1219, at 2 (1964). The words "commercial or financial" were added to the 1964 bill, S. 1666, 88th Cong. (1964), when it was reintroduced in 1965 as S. 1160. The congressional reports on S. 1160 substantially adopted the 1964 Senate Report.

Exemption 4 was intended, according to the legislative history, to extend privacy to a number of interests. Essentially, Congress believed that information, considered private and confidential in business life, should not be compromised simply because the information was transferred to government. Specifically, Congress contemplated that business sales statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiating positions, and like information that customarily would not be made public should not lose their character because the government required that information or otherwise obtained it.

> This exemption would assure the confidentiality of information obtained by the Government through questionnaires or through material submitted and disclosures made in procedures such as the mediation of labor-management controversies. It exempts such material if it would not customarily be made public by the person from whom it was obtained by the Government. The exemption would include business sales statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiation positions or requirements in the case of labor-management mediations. It would include information customarily subject to the doctor-patient, lawyer-client, or lender-borrower privileges such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agency. It would also include information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations.

H. Rep. No. 89–1497, at 10 (1966). The Congressional sentiment, however, was broader than the plain meaning of the statutory language. For example, not all information subject to the doctor-patient or lawyer-client privilege would qualify as financial or commercial information covered by Exemption Four. This overbreadth has been squarely rejected by the courts. *See Brockway v. Dep't of Air Force*, 518 F.2d 1184, 1189 (8th Cir.1975); *Consumers Union*, 301 F.Supp. at 802.

The legislative history reflects an important concern about the need to protect submitters from the competitive disadvantage that could arise from disclosure. *See National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C.Cir.1974); Hearings on S. 1666 Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 88th Cong. 102 (1964) (testifying that "I am thinking of a situation, for example, where the company couldn't qualify for funds, and they have exposed their predic-

ament to the world and it might give competitors unfair advantage to know their weak condition at that time ... there might be some cases where it might be in the public interest if all the facts about a company were not made public"); *id.* at 174 (stating that "[w]e can see no reason for changing the ground rules of American business so that any person can force the Government to reveal information which relates to the business activities of his competitor").

Courts have expressed different definitions of "commercial." They have rejected an approach that focused solely on the nature of the entity submitting the information. Accordingly, information about recruitment efforts provided to the government by labor unions may be exempted from production, even though labor unions do not have profit as their primary aim. *American Airlines,* 588 F.2d at 870. " 'Commercial' surely means pertaining or relating to or dealing with commerce." *Id.* A submitter's "non-profit status is not determinative of the character of the information it reports;" and thus, information may be commercial even if the submitter's interest in gathering, processing and reporting the information is noncommercial. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 830 F.2d 278, 281 (D.C.Cir.1987), *rev'd on other grounds* 975 F.2d 871 (D.C.Cir.1992) (en banc). On the other hand, the commercial status of the submitter is not dispositive, for "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Public Citizen Health Research Group v. Food and Drug Admin.,* 704 F.2d 1280, 1290 (D.C.Cir.1983).

To qualify for the exemption, information itself must in some fashion be commercial or financial in nature or use. Owlsighting data obtained by the Fish and Wildlife Service through payments to a state agency is not exempt, for the "data itself is commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there is no evidence that the parties who supplied the owlsighting information have a commercial interest at stake in its disclosure)." *Nat'l Assoc. of Home Builders v. Norton,* 309 F.3d 26, 38–39 (D.C.Cir.2002) (noting that a "quid-pro-quo exchange between governmental entities does not constitute a commercial transaction in the ordinary sense"). Similarly, "medical care evaluation studies" prepared by physician peer review organizations do not qualify as commercial and exempt, since the studies contained "no data concerning fees, payment schedules, or other commercial arrangements," nor any information regarding "secret formulas or rare treatment methods." *Public Citizen Health Research Group v. Dep't of Health, Educ. & Welfare,* 477 F.Supp. 595, 605 (D.D.C. 1979), *rev'd on other grounds* 668 F.2d 537 (D.C.Cir.1981).

In the case before me, the submitter of the information, GE, clearly is a commercial entity. The information it submitted, however, does not reveal anything about the nature and character of GE's business, or its revenues, expenses or income, or anything that a commercial business would want to protect for fear of competitive injury. There has been no showing that the information had intrinsic commercial value to GE or to its competitors, or was used by GE in any aspect of its daily operations, or that GE had a commercial interest that could be compromised by its disclosure. GE submitted its analyses to advocate a policy position, because it had a financial stake in the outcome of its meetings with the EPA and the OMB, and because it sought to convince the EPA to adopt its less expensive remedy in ad-

334

dressing GE's dumping of PCBs into the Hudson River.

▆ I have noted earlier in this decision that FOIA's central purpose is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," *Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and that the exemptions to disclosure are to be "narrowly construed" in order that they do not swallow up this central purpose, *FBI v. Abramson,* 456 U.S. 615, 630, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). The documents submitted by GE, advocating a position to the EPA and clearly intending to affect its decision, are precisely the kind of information that would shed light on agency decision-making, the heart of the policy underlying FOIA. To categorize this information as "commercial" and therefore exempt would contradict FOIA's strong policy in favor of disclosure. "Like all FOIA exemptions, exemption 4 is to be read narrowly in light of the dominant disclosure motif expressed in the statute." *Washington Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 324 (D.C.Cir. 1989).

The cases relied on by defendants are distinguishable. For example, in *Critical Mass Energy Project v. Nuclear Regulatory Commission,* safety reports about nuclear facilities prepared by a nonprofit corporation and produced to the Nuclear Regulatory Commission were considered to be commercial in nature, for the "commercial fortunes" of the nuclear facilities "could be materially affected by the disclosure of health and safety problems experienced during the operation of nuclear power facilities." 830 F.2d 278, 281 (D.C.Cir. 1987), *rev'd on other grounds* 975 F.2d 871 (D.C.Cir.1992) (en banc). In *M/A-Com Information Systems, Inc. v. U.S. Department of Health and Human Services,* ac-

counting and internal procedures proposed by a company in order to obtain a consent dismissal of a disbarment action could also have led to the potential of competitive detriment by revealing how the company would operate should the case be settled. 656 F.Supp. 691, 692 (D.D.C.1986). In *American Airlines v. National Mediation Board,* the information about a labor union's recruitment efforts was held to be commercial in nature because "the information sought directly affects the status of the union's effort to obtain majority support and ultimate certification." 588 F.2d at 870. In our case, however, GE's analyses do not reveal anything commercially sensitive about the internal workings of GE. The PCB pollution of the Hudson River, resulting from the operations of GE's factories, and GE's advocacy of alternative solutions constitute public information, and the assessments of the remedies that are appropriate to address the environmental damage do not implicate anything about GE's operations.

Accordingly, I hold that the GE analyses are not commercial. The defendants have failed to establish that the information has any intrinsic commercial value, that disclosure would jeopardize GE's commercial interests or reveal information about GE's ongoing operations, or that GE generated the information for a purpose other than advocating a policy to a governmental agency.

ii *"Confidential" Information*

Two tests exist to determine whether information is "confidential." In *National Parks & Conservation Association v. Morton,* the D.C. Circuit articulated the definitive standard adopted by every circuit: information is confidential if disclosure would likely (1) impair the government's ability to obtain necessary information in the future, or (2) cause substantial compet-

itive harm to the person from whom the information was obtained. 498 F.2d 765, 771 (D.C.Cir.1974). The Second Circuit followed the *National Parks* standard in *Continental Stock Transfer & Trust Co. v. S.E.C.*, 566 F.2d 373, 375 (2d Cir.1977), and in *American Airlines*, 588 F.2d at 868. In 1992, the D.C. Circuit modified *National Parks* where information is voluntarily submitted to the government; in these situations, information is confidential if the entity customarily holds such information in confidence. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C.Cir.1992) (en banc).

The Second Circuit has not commented on the *Critical Mass* modification of the *National Parks* test, and no circuit court has expressly adopted *Critical Mass. See, e.g., State of Utah v. Dep't of the Interior*, 256 F.3d 967, 969 (10th Cir.2001); *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor*, 220 F.3d 153, 166 n. 30 (3d Cir.2000); *Frazee v. U.S. Forest Service*, 97 F.3d 367, 372 (9th Cir.1996); *Nadler v. F.D.I.C.*, 92 F.3d 93, 96 n. 1 (2d Cir.1996). A few district courts in the Southern District have cited *Critical Mass* with approval, but with little justification for their conclusion that the Second Circuit would depart from *Continental Stock Transfer & Trust Co.* and *American Airlines* and adopt the *Critical Mass* distinction. *See Pentagen Tech. Int'l Ltd. v. United States*, No. 98 Civ. 4831, 2000 WL 347165, at *2 (S.D.N.Y. March 31, 2000); *Africa Fund v. Mosbacher*, No. 92 Civ. 289, 1993 WL 183736, at *7 n. 3 (S.D.N.Y. May 26, 1993). At least one district court has rejected *Critical Mass. See Comdisco, Inc. v. General Services Admin.*, 864 F.Supp. 510, 517 (E.D.Va. 1994).

▉ *National Parks*, it seems to me, adequately accommodates both voluntarily submitted and compelled information. The first prong of the *National Parks* test,

which examines the potential impairment on the government's ability to obtain necessary information in the future, addresses one of the interests protected by Exemption 4—"the need of government policymakers to have access to commercial and financial data." *National Parks*, 498 F.2d at 767. When submissions are compelled, the government's ability to procure information usually is not impaired because a statute or other mandate ensures future compliance. *See Critical Mass*, 975 F.2d at 878. However, the government should not be required to depend on subpoenas or other enforcement mechanisms to obtain desired information. The first prong of the *National Parks* test thus accounts for the governmental interest in maintaining open access to voluntary submissions, for it requires the court to consider what, if any, impairment disclosure might have on the government's ability to obtain desired information from third-party sources. *See Comdisco*, 864 F.Supp. at 517–18.

The second prong of *National Parks*, which looks at the substantial competitive harm caused to the submitter, does not turn on whether the submission is mandatory or voluntary. This objective component gives added protection to the submitter's interest when he or she provides information to the government. Together, the two prongs of *National Parks* recognize the unique interests of the submitter and the government in the context of either a compelled or voluntary submission.

Adoption of the *Critical Mass* standard would result in too liberal a test for confidentiality, one controlled, not by the central purpose of FOIA, but by the submitter's internal practice. I recognize that the Senate and House reports state, as one purpose of Exemption 4, protection of information that would "not customarily be made public by the person from whom it was obtained by the Government," but that

sentiment should not rise to the equivalent of a statutory definition. The reference to a submitter's "custom" was deliberately taken out of the text of the statute. *See* Part II.A.i., *supra. Cf. Brockway v. Dep't of the Air Force,* 518 F.2d 1184, 1189 (8th Cir.1975) (refusing to subordinate the unambiguous language of Exemption 4 to clearly contradictory legislative history). There is no reason to believe that Congress intended to distinguish between voluntary and compelled submissions. "[T]he inquiry into whether a voluntary submitter customarily releases the disputed information to the general public risks converting the test into a purely subjective one over which the submitter has exclusive or substantial control." *Comdisco,* 864 F.Supp. at 518. Like the *Comdisco* court, I hold that giving conclusive status to that which the submitter characterizes as confidential would cause the definition of "confidential" to become overly broad, and thus undermine the central purpose of FOIA.

Defendants have failed to prove that disclosure would "impair the government's ability to obtain necessary information in the future." *National Parks,* 498 F.2d at 770. Although I give weight to the parties' intention that the information submitted would remain confidential, this expectation of confidentiality alone cannot satisfy the government's burden. *See GC Micro Corp. v. Defense Logistics Agency,* 33 F.3d 1109, 1113 (9th Cir.1994) (stating that "whether the information is of a type which would normally be made available to the public, or whether the government has promised to keep the information confidential, is not dispositive under Exemption 4"); *Center for Public Integrity v. Dep't of Energy,* 191 F.Supp.2d 187, 195 n. 4 (D.D.C.2002) (holding that Exemption 4 does not apply to information provided on a form labeled "Privileged, Confidential, and Highly Sensitive" information); *Burnside–Ott Aviation Training Ctr. v.*

*United States,* 617 F.Supp. 279, 286 (S.D.Fla.1985) (ordering disclosure of information submitted in response to a solicitation for bids that stated that any submission "shall not be disclosed outside the government"). The House Committee on Government Operations rejected such an approach: "[D]isclosure policy cannot be contingent on the subjective intent of those who submit information. For example, it clearly would be inappropriate to withhold all information, no matter how innocuous, submitted by a corporation with a blanket policy of refusing all public requests for information." H.R.Rep. No. 95–1382, at 18 (1978).

Thus, while the submitter's subjective belief is important, it is not dispositive to a determination under the first prong of *National Parks.* A voluntary submitter may have sufficient external incentives to ensure continued government access to the desired information despite the prospect of public disclosure. *See, e.g., Buffalo Evening News, Inc. v. Small Bus. Admin.,* 666 F.Supp. 467, 471 (W.D.N.Y.1987) (holding that the defendant had failed to make the requisite showing under *National Parks,* because the small business borrowers would have chosen to submit their information in order to obtain loans, despite the possibility of disclosure, and because generalizations regarding potential competitive injury are insufficient to override the policy in favor of disclosure); *Racal–Milgo Gov't Sys. v. Small Bus. Admin.,* 559 F.Supp. 4, 6 (D.D.C.1981). Moreover, in certain situations, the government's interest will not be impaired if it could compel the type of information that has been voluntarily submitted. *See Critical Mass,* 975 F.2d at 874–75.

█ GE had significant external incentives to provide the analyses to the government. GE sought to convince the EPA to

abandon, or at least downscale, its dredging plan; to fortify its arguments, it provided the information at issue here. Supplying this information was central to GE's advocacy efforts. The defendants have not established that concerns about confidentiality outweigh the considerable external incentives to submit the analyses. Thus, I conclude that the government cannot satisfy *National Parks* and the information must be disclosed.[3]

I also hold that, even if *Critical Mass* applied to this case, the government has not met its burden. Under *Critical Mass,* the defendants must demonstrate that GE would "customarily hold such information in confidence." While the confidentiality agreement between GE and the EPA and the "privileged and confidential" marking placed on some of the documents evince GE's intent that the analyses be treated as confidential, defendants have not established GE's "custom" with respect to this information. GE has not come forward to invoke Exemption 4's protection, and the government's allegations of confidential treatment are not based on personal knowledge. During oral argument, I asked whether I should delay decision until I received an affidavit from GE; the government responded that such an affidavit is not necessary, and in their briefs, cite two cases in which the submitter was not directly involved. However, without a statement by GE about its customary practice with regard to these documents, any finding of exemption would be based on agency speculation. *Cf. Grand Central P'ship, Inc. v. Cuomo,* 166 F.3d 473, 480 (2d Cir.1999).

For the reasons discussed above, I hold that the GE analyses are neither "commercial" or "confidential," and thus do not warrant withholding under Exemption 4.

**B.  *Documents Withheld Pursuant to Exemption 5***

Under Exemption Five, 5 U.S.C. § 552(b)(5), "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempted from FOIA disclosure. Exemption 5 incorporates the "deliberative process" privilege, which protects pre-decisional, deliberative inter-agency or intra-agency documents. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150–154, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). A record is pre-decisional when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). A record is deliberative when "it reflects the give-and-take of the consultative process." *Wolfe v. Dep't of Health and Human Servs.,* 839 F.2d 768, 774 (D.C.Cir.1988).

> The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position. To test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public

---

**3.**  Because the government has not argued that exemption is warranted under the second prong of *National Parks,* I do not address whether the defendants have proven that disclosure would cause substantial competitive harm to GE.

disclosure is likely in the future to stifle honest and frank communication within the agency ... the privilege applies only to "opinion" or "recommendatory" portion, not to factual information which is contained in the document.

*Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980).

The defendants withheld six sets of notes made by EPA and OMB officials pursuant to Exemption 5. After *in camera* review, I concluded that OMB documents 2 and 6, EPA documents 18 and 19, the last six pages of the eight-page EPA document 14, and the last two pages of the six-page EPA document 15 clearly fell under Exemption 5. The information contained in these documents reflected the suggestions, recommendations, and subjective impressions of their authors, all of whom are agency officials.

■ The first two pages of EPA document 14 and the first four pages of EPA document 15 are handwritten notes taken by EPA official William Muszynski during July 11, 2001 and July 26, 2001 meetings with GE, summarizing certain statements made by GE officials. These certainly are "pre-decisional" documents, for they were prepared in the process of reaching a decision about the EPA remedy; the key question is whether they qualify as deliberative. After consideration of Muszynski's declaration, I conclude that these pages are also exempt from disclosure.

According to Muszynski, the notes "do not contain verbatim notes," but contained his "selective impressions" "of those things that were of particular relevance to my views and concerns regarding the Agency's potential courses of action for the Site." Muszynski Supp. Decl. ¶¶ 2, 5. Muszynski emphasized points of major concern with marks such as asterisks and underlining, and included his personal observations and commentary on GE's statements. *See*

Muszynski Supp. Decl. ¶¶ 3, 4, 6. These notes were intended for his exclusive personal use, primarily to assist his memory. Muszynski Supp. Decl. ¶ 8.

The notes at issue are deliberative, because they "(i) formed an essential link in a specified consultative process, (ii) 'reflect[ ] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" *Providence Journal Co. v. U.S. Dep't of the Army,* 981 F.2d 552, 559 (1st Cir.1992) (quoting *Nat'l Wildlife Fed'n v. Forest Serv.,* 861 F.2d 1114, 1118–19 (9th Cir.1988)). The EPA held these meetings while working out its policy on the dredging remedy, and Muszynski's notes were part of the deliberative process in arriving at the EPA's final position. *See Strang v. Collyer,* 710 F.Supp. 9, 12 (D.D.C.1989) (finding that handwritten meeting notes relating to position to be taken by NLRB in amicus brief within exemption 5 because "notes are part of the deliberative process in arriving at the final position taken in the Beck case"). Because the notes reflect Muszynski's priorities and interest in particular topics or statements during the meetings, disclosure "would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermines the agency's ability to perform its functions." *Quarles v. Dep't of Navy,* 893 F.2d 390, 392 (D.C.Cir.1990). *See also Mapother v. Dep't of Justice,* 3 F.3d 1533 (D.C.Cir. 1993) (withholding a report concerning the activities of a former UN Secretary–General, because the selection of facts involved the formulation or exercise of policy-oriented judgment); *Montrose Chem. Corp. v. Train,* 491 F.2d 63 (D.C.Cir.1974) (withholding a staff-prepared summary of factual evidence which was prepared to assist the EPA Administrator in formulating his

decision concerning regulation of the pesticide DDT, because the EPA staff made judgments about what evidence would be important to the Administrator). I therefore find that these documents may be withheld under Exemption 5.

### III. *Conclusion*

For the reasons stated, I grant plaintiff's motion as to the materials withheld pursuant to Exemption 4 and I grant defendants' motion as to the materials withheld pursuant to Exemption 5. Documents withheld solely on the basis of Exemption 4 shall be disclosed. With respect to materials withheld under both Exemption 4 and Exemption 5, the parties shall confer and submit a joint letter to me regarding any disputes, or lack thereof, by March 21, 2003.

SO ORDERED.