**Joshua PHILLIPS, Plaintiff,**

v.

**IMMIGRATION AND CUSTOMS ENFORCEMENT,
Defendant.**

No. 03 Civ. 01721(RJH).

United States District Court,
S.D. New York.

Feb. 14, 2005.

David C. Vladeck, Richard McKewen, Georgetown University Law Center, Washington, DC, Debra L. Raskin, Vladeck, Waldman, Elias & Engelhard, New York City, for Plaintiff.

David N. Kelley, United States Attorney, Southern District of New York, Mi-

chael R. Holden, Assistant United States Attorney, Of Counsel, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HOLWELL, District Judge.

Plaintiff, Joshua Phillips ("Phillips"), is a freelance journalist who brings this action to contest the partial denial by defendant Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS") of his requests for the production of certain documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Pending before the Court are the parties' cross-motions for summary judgment. The issue common to both motions is whether the government properly withheld or redacted documents responsive to plaintiff's FOIA requests. For the reasons set forth below, the motions are granted in part and denied in part.

## BACKGROUND

This case arises from plaintiff's efforts to secure the production of selected portions of government records relating to the immigration status of two former military officials of El Salvador, General Jose Guillermo Garcia, El Salvador's Minister of Defense from 1979 to 1983, and General Carlos Eugenio Vides–Casanova, Director–General of El Salvador's National Guard during the same period. ICE's predecessor, Immigration and Naturalization Service ("INS"), granted Garcia asylum in 1989 and granted Vides–Casanova permanent residency status also in 1989.

The activities of the generals prior to their immigration to the United States have been a matter of great controversy. Both Garcia and Vides–Casanova held office during El Salvador's bloody civil war. The war precipitated numerous human rights atrocities including the activities of so-called "death squads" that are alleged

to have murdered or tortured thousands of innocent noncombatants. *See, Report of the United Nations Truth Commission in El Salvador* (1993), *available at* http://www.derechos.org/nizkor/salvador/informes/truth.html. Members of El Salvador's armed services, in particular the National Guard, directly participated in these crimes. *Id.* at 43. The most infamous incident involved the rape and murder of four American churchwomen that was the subject of a non-public report prepared by a former member of this Court, the Honorable Harold R. Tyler, Jr., at the request of the State Department. *See, The Churchwomen Murders: A Report to the Secretary of State* (1983), *available at* http://www.foia.state.gov/documents/churchwomen/385d.PDF.

Garcia and Vides–Casanova have long been accused of either participating in or covering up the involvement of military personnel in these atrocities. Two civil cases against the former guards have been brought in the Southern District of Florida under the Torture Victims Protection Act ("TVPA"). In one case, brought by the estates of the four American churchwomen, a jury returned a verdict for defendants. *See Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283 (11th Cir. 2002). In the other case, a jury awarded $54.6 million in damages against the defendants based upon a finding of "command responsibility" under the TVPA for the torture of three Salvadorans. *See Juan Romagoza Arce v. Jose Guillermo Garcia and Carlos Eugenio Vides–Casanova,* No. 99–8364, 2002 WL 32119009 (S.D.Fla.2002), Trial Transcript at 2472–80 and 2580–83, *available at* http://www.cja.org/case s/Romagoza_Docs/Romagoza_Trial_Transcripts.shtml. By its FOIA requests, plaintiff seeks to determine what information INS possessed regarding the generals' alleged role in the atrocities and whether this information

was considered at the time that Garcia was granted asylum and Vides–Casanova was granted residency. (Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl. Reply Mem.") at 7–8.)

Plaintiff filed its initial FOIA request on July 10, 2002. This request was denied on the grounds that plaintiff had failed to provide consents from Garcia and Vides–Casanova to the release of any materials. A second set of requests was filed on October 29, 2002 followed by the initiation of this litigation on March 14, 2003. In response to the second FOIA request, DHS undertook a broad search of the agency's records and located four series of documents. (Declaration of Ave M. Sloane ("Sloane Decl.") ¶ 33.) The first series (Series "A") consists of the generals' so-called A-files, which are kept by ICE with respect to an alien's immigration status, and includes documents such as visa and asylum applications. The second series (Series "B") pertains to documents compiled in an "ongoing" investigation of the propriety of Garcia and Vides–Casanova's immigration status and whether enforcement actions should be taken to revoke their resident status. Series B documents include files gathered in an earlier INS investigation of the same issues that had been mandated by Section 595(b)(5) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("OCESAA"), 1999, Pub.L. No. 105–277, 112 Stat. 2681 (October 21, 1998). This investigation concluded with a three-page non-public report prepared by INS and entitled "Report to Congress Regarding the Entry into the United States of Salvadoran Generals Jose Guillermo Garcia Merino and Carlos Eugenio Vides–Casanova" (herein-

after "Report to Congress"). The Report to Congress is included in the Series B documents. A third series of documents ("Series C") consists primarily of internal correspondence and e-mails maintained by ICE's Office of Congressional Relations. The final category of documents ("Series D") was located in the files of ICE's Office of General Counsel and consists of duplicates of the A-files as well as internal documents relating to the agency investigations of the generals. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("D.Mem.") at 11–12.)

On October 16, 2003, DHS produced to plaintiff approximately 2178 pages of documents responsive to his FOIA requests. A supplemental production of 45 pages of documents was made on October 31, 2003. Approximately 90 pages out of the 2,223 pages produced were redacted in part and an additional 669 pages were withheld in full on the grounds that they were subject to various FOIA Exemptions. DHS also produced a "Vaughn Index" describing the redacted or withheld documents and setting forth the basis for non-disclosure. (Sloane Decl., Ex. A); *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).[1]

During the briefing of the cross-motions for summary judgment, two developments occurred. Plaintiff narrowed his request to 383 pages of the approximately 760 pages listed on the Vaughn Index. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl.Mem.") at 3 n. 3.) And DHS upon further review released all or part of 103 pages identified in plaintiff's

---

**1.** A "Vaughn Index" typically consists of "a detailed affidavit, the purpose of which is to permit the court system effectively and efficiently to evaluate the factual nature of dis-

puted information." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 149 n. 2, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) (citing *Vaughn*, 484 F.2d at 826).

narrowed requests. (Supplemental Declaration of Ave M. Sloane, February 19, 2004 ("Sloane Supp. Decl.") ¶¶ 7–9, 11 and 21–22.) This decision, therefore, addresses the approximately 280 pages of documents that remain in dispute. As a matter of judicial economy, the Court directed defendant to submit all of the contested documents to it for *in camera* review. *Donovan v. Federal Bureau of Investigation*, 806 F.2d 55, 59 (2d Cir.1986); *Lawyers Committee for Human Rights v. Immigration and Naturalization Service*, 721 F.Supp. 552, 556 (S.D.N.Y.1989) (while courts are not obligated to conduct *in camera* reviews, they may, in their discretion, do so).

## DISCUSSION

### I. *Purpose of FOIA*

FOIA reflects a strong Congressional policy of requiring full public disclosure of documents and records maintained by federal agencies. Underlying this policy is the precept that open government allows "an informed citizenry to hold the governors accountable to the governed." *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir.1999) (internal citations and quotations omitted). Accordingly, every federal agency is required under the Act to make its records "promptly available to any person" upon receipt of a reasonably articulated request. 5 U.S.C. § 552(a)(3).

The policy of broad disclosure is not without limitation. Congress has provided for nine statutory exemptions from the requirements of the Act, three of which are at play in the present case. Exemption 5 excludes from production documents which are subject to a legal claim of privilege. 5 U.S.C. § 552(b)(5) (exempting "memorandums or letters which would not

be available by law to a party ... in litigation with the agency."). Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7 places limits upon the production of documents "compiled for law enforcement purposes" if to do so would result in specific harms identified in the statute. The specific harms relevant here relate to claims by DHS that the release of certain investigative files "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), or "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[2]

██ Both Exemption 6 and Exemption 7(C) seek to protect the privacy interests of individuals who are identified or discussed in an agency's records. Exemption 7(C) applies only to an agency's "investigative files," although precisely what documents constitute such files is frequently a matter of dispute, as it is in this case. 5 U.S.C. § 552(b)(7). Exemption 6, by contrast, applies to any files maintained by an agency that are "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6). The Supreme Court has defined "similar files" broadly so as to include any "detailed Government records on an individual which can be identified as applying to that individual." *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982) (internal citations and quotations omitted). Under both Exemption 6 and 7(C), the Court is required to evaluate the threatened invasion of privacy interests and determine whether these in-

---

**2.** DHS has also relied on Exemption 2, relating to internal rules and practices of an agency, as the basis for redacting internal phone numbers. (Sloane Decl., Ex. A ¶ 2.) Plaintiff does not contest these redactions.

terests outweigh the public's interest in disclosure. *United States Department of Justice v. Reporters Committee*, 489 U.S. 749, 762, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *Perlman v. United States Department of Justice*, 312 F.3d 100, 106 (2d Cir.2002). However, the threshold for determining whether a threatened invasion of privacy is unwarranted is somewhat lower under Exemption 7(C). *Perlman*, 312 F.3d at 106 (noting that the standard for evaluating a threatened invasion of privacy interests under Exemption 7(C) is "broader" than the standard applicable to personnel, medical and similar files under Exemption 6). While the government's burden under Exemption 6 is to prove that the invasion of privacy would be "clearly unwarranted," Exemption 7(C) requires only that the information, if released, "could reasonably be expected to constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(B)(6) and 7(C). *United States Department of State v. Ray*, 502 U.S. 164, 172, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991).

## II. *Application of the Exemptions*

■ The disputed documents fall within 18 categories of documents identified on the Vaughn index. (Sloane Decl., Ex. A.) A category may consist of a single numbered page or may consist of a file of documents containing up to 140 numbered pages. The government claims that each category is subject to at least two and as many as four separate exemptions. Plaintiff claims that no exemptions apply to any of the 18 categories of documents. Because most categories cannot be easily grouped for the purpose of analyzing the claimed exemptions, the Court will review each category *seriatum.* Where the Court finds that a particular document has been properly withheld based on a particular exemption, it will not rule on the applicability of the other claimed exemptions.

## Category 1: Record of Asylum Interview (A36, 49–50)

This document consists of two pages of handwritten notes of an interview of Garcia by an INS official following his request for asylum (A49–50), as well as a brief summary of the interview and an initial assessment of Garcia's request (A36). DHS seeks to withhold the document on the ground, *inter alia*, that it is a privileged communication covered by Exemption 5. As noted, Exemption 5 incorporates all of the normal civil discovery privileges including the attorney-client, work product and executive privileges. *Grand Central Partnership v. Cuomo*, 166 F.3d 473, 481 (2nd Cir.1999).

■ The specific privilege claimed by DHS is the deliberative process privilege which is an aspect of the executive privilege. *Id.* The deliberative process privilege is intended to "protect the decision-making process of government agencies" and "encourage the frank discussion of legal and policy issues." *Wolfe v. Department of Health & Human Services*, 839 F.2d 768, 773 (D.C.Cir.1988) (*en banc*) (internal citations and quotations omitted). The scope of the privilege "covers documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (internal citations omitted).

■ To qualify for the deliberative process privilege, the government must show that the documents are both "pre-decisional" and "deliberative." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 186, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). Documents are pre-decisional when they precede an agency decision and are prepared in order to assist an agency

in arriving at its decision. *Grand Central Partnership*, 166 F.3d at 482 (citing cases). Documents are deliberative when they comprise part of the process by which government decisions are made. *Id.*

■ Applying these standards, the Court concludes that the handwritten notes in dispute are both pre-decisional and deliberative. They are pre-decisional in that they predate INS' decision to grant asylum to Garcia and were obviously prepared to assist INS decision makers. Likewise, the documents on their face form the basis for a "preliminary assessment" that was part of INS' deliberative process. (Sloane Supp. Decl. ¶ 5); see *Judicial Watch, Inc. v. Reno*, 2001 WL 1902811, at *4 (D.D.C. March 30, 2001) (handwritten notes of interview with asylum subject's grandmothers properly withheld under Exemption 5).

■ Plaintiff ultimately does not contest these conclusions but argues that the handwritten notes are largely factual (reflecting an interview of Garcia) and that Exemption 5 covers opinions and recommendations but not statements of facts. (Pl. Reply Mem. at 13 (citing *Grand Central Partnership*, 166 F.3d at 479–81)). Plaintiff is correct to the extent that "purely factual" material that does not reflect an agency's deliberative process should be disclosed. *Grand Central Partnership*, 166 F.3d at 482. However, where the factual portions of a deliberative process cannot be "severed from its context," the factual material remains exempt from disclosure. *Id.* For example, a report prepared by the Department of Justice on former U.N. Secretary–General Kurt Waldheim was properly withheld although it contained substantial factual information, much of which was public. *Mapother v. Department of Justice*, 3 F.3d 1533, 1538–

40 (D.C.Cir.1993). The court concluded that the deliberative process applied because:

> [T]he majority of the Waldheim Report's factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action.

*Id.* at 1539; *Reno*, 2001 WL 1902811, at *4 (notes of interview in asylum case protected because release could reveal how interviewer prioritized different facts in deliberating).

The asylum interview notes in the present case do not purport to be a verbatim transcript. Rather they appear to reflect a selective recording of information particularly pertinent to Garcia's request for asylum. As such, they "contain factual matter that can[not] be severed from its context" and are exempt from disclosure. *Grand Central Partnership*, 166 F.3d at 483; *New York Public Interest Research Group v. U.S. E.P.A.*, 249 F.Supp.2d 327, 338 (S.D.N.Y.2003).[3]

**Category 2: Attachments to Asylum Request (A69–166)**

■ These documents comprise the attachments to Garcia's request for asylum. They consist of his affidavit setting forth the basis for his application, a series of supporting affidavits attesting to the basis for the application, passports, birth certificates and other supporting information of both a public and non-public nature. DHS withheld both the request for asylum and the attachments thereto on the grounds that production would (under Exemption 6), or could (under Exemption 7C) constitute an unwarranted invasion of personal

---

**3.** The Court notes that its *in camera* inspection of A36, 49–50 confirms DHS' representation that the notes contain no information

regarding the alleged role of Garcia in the commission of war crimes or other atrocities in El Salvador. (Sloane Supp. Decl. ¶ 5.)

privacy. Plaintiff is not presently seeking production of the asylum request itself, presumably because he has concluded that it is likely covered by an exemption. However, plaintiff continues to seek production of some 97 pages of attachments to the request.

As an initial matter, it appears that the attachments to Garcia's asylum request are, broadly speaking, the type of document that falls within the scope of Exemption 6 which, by its terms, applies to "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6). While attachments to an asylum request are neither personnel or medical files, the Supreme Court has made clear that the phrase "similar files" is intended to cover personal information contained in any government records, regardless of how they may be labeled. *Washington Post*, 456 U.S. at 602, 102 S.Ct. 1957. Plaintiff acknowledges the judicial interpretation of "similar files", but seeks to limit the scope of the exemption to files of an "intimate personal nature" that necessarily excludes information as to an individual's professional activities. (Pl. Mem. at 23; Pl. Reply Mem. at 9.) Plaintiff contends, therefore, that documents in the attachments to the asylum request that refer to Garcia's professional (i.e.military) activities, including his participation in wartime atrocities, are subject to production.

Leaving aside the fact that the attachments to Garcia's asylum request are bereft of references to war crimes or atrocities (Sloane Supp. Decl. ¶ 6), plaintiff's proffered interpretation is contrary to the explicit holding in *Washington Post* that Exemption 6 applies equally to intimate and non-intimate information:

> In sum, we do not think that Congress meant to limit Exemption 6 to a narrow class of files containing only a discrete kind of personal information. Rather, "[t]he exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual". H.R.Rep. No. 1497, *supra,* at 11, U.S.Code Cong. & Admin. News 1966, p. 2428.

*Id.,* 456 U.S. at 602, 102 S.Ct. 1957 (footnotes omitted). Thus information such as date and place of birth, employment history "and comparable data [that] is not normally regarded as highly personal" is potentially exempt. *Id.* at 600–601, 102 S.Ct. 1957. Attachments to an individual's asylum request consisting of personal history data and supporting affidavits relating to the subject surely fall within this definition.

Having determined that the attachments that form a part of Garcia's request for asylum are "similar files" within the scope of Exemption 6, the Court must then determine whether release of that information would constitute a "clearly unwarranted" invasion of any person's privacy. This analysis is not undertaken in a vacuum but is accomplished by balancing an individual's right of privacy against the public's interest in disclosure, *Perlman,* 312 F.3d at 106, keeping in mind, of course, that the basic purpose of the FOIA is "to open agency action to the light of public scrutiny." *Department of Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (internal quotations omitted). While each party denigrates the other's position, there are substantial privacy concerns and public interests at play in this case.

When reviewing documents that are an integral part of an individual's request for asylum, there can be little doubt that strong privacy concerns are implicated. Indeed, confidential treatment of all records relating to an asylum application is mandated by the Code of Federal Regulations:

> (a) Information contained in is pertaining to any asylum application [and] rec-

ords pertaining to any credible fear determination ... shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records ... that indicate that a specific alien has applied for asylum [or] received a credible fear or reasonable fear review shall also be protected from disclosure ...

8 C.F.R. § 208.6 (2003). Moreover, the fact that a government agency has effectively promised confidentiality to persons supplying information to it creates justifiable expectation of privacy. *See Ray,* 502 U.S. at 177, 112 S.Ct. 541 (assurance of confidentiality given in connection with interviews of returned Haitian nationals considered a significant factor in evaluating relevant privacy interests); *Public Citizen, Inc. v. Resolution Trust Corp.,* 1993 WL 1617868, at *4 (D.D.C. March 19, 1993) (agency pledge of confidentiality "increases the privacy interests at stake.") (internal citations omitted).

While the confidentiality provisions of 8 C.F.R. § 208.6 may not be dispositive, courts have previously recognized the sensitive nature of asylum records. As the D.C. Circuit noted in upholding the application of Exemption 6, "[a]n asylum application contains personal information about the applicant and his family, including his personal history and political views, the release of which not only threatens the individual's privacy, but may very well endanger his life and the safety of other family members." *Reno,* 2001 WL 1902811, at *8 (internal citations omitted); *McCutchen v. United States Dep't of Health & Human Services,* 30 F.3d 183, 189 (D.C.Cir.1994) (recognizing a strong privacy interest where individuals might face retaliation); *Ripskis v. Dep't of Housing & Urban Dev.,* 746 F.2d 1, 3 (D.C.Cir. 1984) (Exemption 6 protects "intimate details the disclosure of which would be likely to cause embarrassment."); *Judicial Watch, Inc. v. United States Department of Commerce,* 83 F.Supp.2d 105, 112 (D.D.C.1999) (withholding visa and passport data).

Plaintiff seeks to sidestep the privacy interests of asylum applicants by arguing that Garcia has lived in Florida for 15 years and would not be placed at risk of persecution if his asylum records were produced. (Pl. Mem. at 29–30.) There are two problems with this contention. First, it ignores the fact that there are parties, including the DHS, who maintain some level of interest in removing the former generals from the United States. (Sloane Decl. ¶ 50.) Thus the issue of personal risk cannot be entirely dismissed. Second, plaintiff's implicit proposal that the right to privacy would depend on a court's evaluation of the degree of risk to a particular asylum applicant is unworkable. Plaintiff also contends that as former high government officials, neither Garcia nor Vides–Casanova have any legitimate privacy interest. (Pl. Mem. at 26–28.) However, this argument confuses the existence of a privacy interest (which even high government officials may possess) with consideration of the competing interest of the public in the disclosure of government records. The privacy interests of U.S. government officials might be "somewhat diminished" due to the countervailing interest of the public "to be informed about what their government is up to," *Perlman,* 312 F.3d at 107 (internal citations omitted). However, this rationale would appear to be inapplicable to former foreign government officials.

Nevertheless, plaintiff identifies a legitimate public interest in gathering information on the decision to admit or grant asylum to Garcia and Vides–Casanova. Both individuals were publicly accused of complicity in notorious human rights viola-

tions and, without resolving that issue, it is a legitimate inquiry to ask via a FOIA request what INS knew of the generals' alleged roles at the time it granted them admission to or asylum in the United States. (Pl. Reply Mem. at 7–8.) Defining the public interest, however, does not resolve the issue of whether that interest outweighs the interest of an asylum seeker (and others identified in the request) in the continued confidentiality of the asylum request, including the attachments submitted in support thereof.

Defendant proposes to answer this question by application of a bright-line rule against disclosure of such information. (D. Mem. at 30–31.) In so doing, defendant relies upon *Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 776, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), where the Supreme Court adopted a general prohibition against disclosure of "rap sheet" information based on a "categorical balancing" of individual privacy interests and the public interest in disclosure. Given the strong policy reasons for maintaining confidentiality in the asylum process, there are persuasive reasons to adopt a bright-line test that would be applied even in the case of an asylum seeker such as Garcia, who is himself charged with human rights abuses. The Court's *in camera* review of the attachments to the asylum request, however, indicates that the Court need not adopt a rule of general applicability. Since none of these documents refer or relate to any possible human rights violations by Garcia, or anyone else for that matter, they shed no light on the issue of whether INS considered such allegations in deciding to grant Garcia's request for asylum. In this context, the disclosure of the asylum request attachments sought by plaintiff would serve no compelling public interest and is greatly outweighed by the recognized need for confidentiality in asylum matters.

**Category 3: Report to Congress (A167–69)**

 As noted, when Congress enacted the OCESAA in 1999, it directed the Attorney General to "review the circumstances under which individuals involved in either the murders or the cover-ups of the murders [of the four American churchwomen] obtained residence in the United States" and to submit a report to Congress setting forth the results of the investigation. (Sloane Decl. ¶ 48.) That report was produced to plaintiff subject to three limited redactions, which were made on privacy grounds under Exemptions 6 and 7(C). However, Exemption 7(C) is limited on its face to "records compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Since the report in question was prepared for Congress, this exemption is unavailable to defendant. Exemption 6, however, is applicable to two of the three redactions in that they relate to (a) personal information concerning Garcia and Vides–Casanova taken from their INS A-files and (b) information regarding an unrelated third party. The remaining redaction, consisting of the last line of the first paragraph and the last three lines of the concluding paragraph, reflects INS' evaluation of whether the generals were subject to removal proceedings. Other paragraphs in the unredacted portions of the report disclose INS' conclusion that both Garcia and Vides–Casanova entered the U.S. lawfully and were lawfully granted Lawful Permanent Residence (LPR) status. In light of this disclosure, the Court can discern no cognizable privacy interest in withholding INS' concomitant conclusion that they were not amenable to removal proceedings.

**Category 4: E–Mails Between INS Employees and a Third Party (B1086–1088)**

These documents relate to allegations made against the generals by a private

non-governmental organization. The documents have been produced with the limited redaction of the names of the individuals or other identifying information. (Sloane Supp. Decl. ¶ 8.) There is no significant public interest in the redacted information that would outweigh the privacy interests of the individuals referenced in the documents.

**Category 5: Report Prepared for Garcia (B1095–1195)** ·

This appears to be a proposal made by a private consulting firm to General Garcia as Minister of Defense for the development of a security program in El Salvador in 1982. It has now been produced except for limited identifying information that was properly redacted under Exemption 6. (*Id.* ¶ 9.)

**Category 6: INS Internal E–Mails Regarding Investigation (B1201–1208)**

■ Although the Attorney General's Report to Congress in 1999 set forth INS' conclusion that the generals were not subject to removal, the agency continued thereafter to investigate the generals' immigration status and to consider the viability of removal proceedings. Certain e-mails reflecting intra-agency discussions and deliberations as to strategies and tasks to be undertaken in that investigation have been withheld from production. (*Id.* ¶ 10.) With one exception, these documents are clearly pre-decisional and reflect the give and take of a consultative process. Accordingly, they are subject to the deliberative process privilege and properly withheld pursuant to Exemption 5. One of the e-mails (B1207), however, appears to be exclusively a report on the criticism by a congressman of the Report to Congress. The e-mail does not appear to reflect or reveal the deliberative process within INS regarding any pending investigation. Nor does it reveal any personal information save for the identity of certain INS employees and certain congressman or sena-

tors. Consequently the document is not privileged under Exemption 5; nor does it implicate privacy interests under Exemptions 6 or 7. Subject to the redaction of limited identifying information, this e-mail should be produced.

**Category 7: Biographical Material Regarding Vides–Casanova (B1212, 1215–1352)**

These documents, all in Spanish, disclose detailed personal information about Vides–Casanova's life in El Salvador. As noted in the Vaughn Index, they include tax declarations, identification documents, employment histories and the like. (Sloane Decl., Ex. A at 9). The documents contain no information about the subject's alleged role in atrocities in El Salvador or about how INS officials made any decisions regarding Vides–Casanova's residency status in the U.S. The documents were properly withheld from production under Exemption 6.

**Categories 8, 9 and 10: INS Intra–Agency E–Mails (B1882–83; D187, D188–92)**

■ Documents numbered B1883, D189 and D191–92 consist of brief e-mails among INS attorneys regarding the applicability of the Privacy Act to a request by a U.S. senator for copies of the generals' A-files. These communications are protected by the attorney-client privilege and properly withheld under Exemption 5. Documents numbered B1882, D190 and D188 consist of brief intra-agency e-mails discussing strategies for the ongoing investigation of the generals' immigration status. The communications are both pre-decisional and deliberative. The Court finds that they are properly withheld from disclosure under Exception 5 as falling within the deliberative process privilege. Document numbered D187 is an e-mail/memo to the file written by an INS attorney. Other recipients, if any, are not iden-

tified. Certain redacted portions contain identifying information and were properly withheld under Exemption 6. The concluding paragraph contains the author's personal evaluation of information gathered in the course of the INS investigation of Garcia and Vides–Casanova. This e-mail reflects ongoing internal deliberations of a government agency and is also exempt from disclosure on the basis of the deliberative process privilege.

**Category 11: Notes of Interagency Meeting (D269–71)**

This document contains handwritten notes by an unidentified government employee of an interagency meeting held on August 28, 1998. This meeting appears to be the same meeting that is referred to in the Report to Congress. (A167–169.) The notes indicate that three subjects were discussed at the meeting: (1) the status of the declassification of documents regarding El Salvador undertaken or being undertaken by various government agencies;[4] (2) whether visas were properly given to the generals; and (3) whether removal of the generals was possible. Those portions of the document that refer to the status of the declassification process are not deliberative, nor do they raise privacy concerns. Consequently, these portions of the document (D270, lines 1–3, 12–19) should be produced. The first eight lines of D269, which detail the time, place and subject matter of the meeting are also subject to production since they do not reveal the deliberations of the attendees. However, the portion of the notes relating to an investigation as to the propriety of the admission and possible removal of the generals (D269, lines 9–24; D270, lines 5–11) were properly withheld

under the deliberative process privilege. These passages reflect the early stages of an INS investigation and reflect the give and take of the internal decision-making process. While it could be argued that a discussion of INS' prior decisions to admit the generals was post-decisional, the reality of the situation is that the propriety of admission was being examined in the context of evaluating the feasibility of initiating removal proceedings. In this light, the discussions at the August 23, 1998 meeting were part of a deliberative process that ultimately resulted in the Report to Congress prepared in 1999.

**Categories 12–14: Memoranda to the File (D284, 299, 300)**

An INS counsel participating in the investigation of the generals' immigration status wrote these three brief memoranda. The names and telephone numbers of the government employees identified in each of these memoranda were properly deleted under Exemption 6. However, the deleted passages in D284 and D300 which simply state that the NSC and the USCS, respectively, had no information on the alleged role of the generals in the murder of the four American churchwomen do not reveal any personal information and cannot be redacted on privacy grounds.

 There are two substantive deletions in document D299. The first deletion, referring to a third party accused of human rights violations in El Salvador, was properly made under Exemption 6. The second deletion refers to the author's evaluation of certain Department of State cables relating to the nuns' case. As noted, the author is a lawyer working for INS on that agency's ongoing investigation of the generals. As such, the redacted por-

---

4. In enacting the OCESAA, Congress urged that "information relevant to the murders [of the American churchwomen] should be made public to the fullest extent possible" and that agencies and departments that possess relevant information "should make every effort to declassify and release" such information. OCESAA § 595(b)(1) and (3).

tion is subject to both a work product and a deliberative process privilege.

### Category 15: Central Index System Printouts (D317–18)

These printouts contain summary data as to the generals' dates of birth, A-file numbers, immigration status and history. The documents are within the scope of Exemption 6 although the Court notes that the generals' current immigration status has already been disclosed by DHS and, therefore, should not be redacted. *See* A167.

### Category 16: INS Letter to Senator Feingold (D328–29)

 This letter from INS' Acting Director of Congressional Relations is described by its author as a "supplement" to the Report to Congress. Certain information regarding the generals' visas has been redacted from the first page of the letter. This is the type of personal information that is appropriately withheld under Exemption 6. *Judicial Watch v. United States Dept. of Commerce,* 83 F.Supp.2d at 112. The three redactions on page two of the letter, however, are of a different nature. The first two passages relate to the reasonableness of the INS determination, previously disclosed in the Report to Congress, that Garcia and Vides–Casanova were eligible for admission and permanent residency in the United States. The third passage discusses the meaning of a reference in the Report to Congress to Vides–Casanova being a "key ally" in the investigation of the nuns' case. Both the INS determination as to the legal residency of the generals and the reference to Vides–Casanova being a "key ally" were freely disclosed by DHS when it produced the Report in response to plaintiff's FOIA requests. *See* A167–169. Having taken this step, there is no logical basis for defendant's contention that the elucidation of these points in a self-described supplement now raises privacy concerns that justify an exemption from production.

### Category 16 and 17: INS Memoranda (D333–337)

These two memoranda were prepared by an INS attorney reviewing that agency's determination that Garcia and Vides–Casanova, respectively, were properly admitted to the U.S. and were not amenable to removal. While certain portions of both memoranda were ultimately produced, significant redactions were made on the basis of privilege and privacy. (Sloane Decl., Ex. A at 31.) Defendant contends that both documents were prepared in anticipation of litigation and, therefore, are subject to the attorney-client and work product privileges. *Id.* However, the author of the memoranda has not submitted an affidavit to the Court attesting to their provenance, and one of the memoranda suggests that they were actually prepared for a presentation to a member of Congress. The Court notes that the date of the memoranda, October 4, 2000, happens to be the day before the INS meeting with Senator Feingold (referred to in the INS letter to the Senator (D328–29)), further indicating that these memoranda were prepared in anticipation of that meeting. In the absence of further direct evidence as to the origin of these documents, the Court concludes that defendant has not met its burden of establishing the applicability of Exemption 5.

 With respect to the claim of privacy, the Court finds that the deletions in both memoranda in the first paragraph and the third paragraph (with the exception of the final phrase) were properly made. These deletions relate to personal information that falls within Exemption 6 for the reasons previously stated. The remainder of the redactions, however, relate to INS' determination that the gener-

als were properly admitted, and that there were no grounds for their removal. Information regarding the first determination was voluntarily disclosed to plaintiff (A167–169), and the Court has determined that information regarding the second determination, having been made to Congress in a final report, ought to be made available to the plaintiff. The remainder of the redacted material relates to proposed legislation for the removal of aliens and implicates no privacy concerns. Accordingly, these passages should also be disclosed.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [13] is granted in part and denied in part and defendant's cross-motion for summary judgment [19] is granted in part and denied in part. The Clerk of the Court is directed to enter Judgment in accordance with this Opinion and to close this case.